# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

CASSANDRA JOHNSON,                            Case No. 1:07-cv-291
    Plaintiff

                                (Hogan, M.J.)

    vs

AK STEEL CORP., et al.,                       **ORDER**
    Defendants


Plaintiff Cassandra Johnson brings this action through counsel against defendants AK Steel Corp. ("AK Steel") and Strom Engineering ("Strom") alleging that defendants discriminated against her on the basis of her sex in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000 *et seq.*; in violation of Ohio Rev. Code § 4112.02(A) and Ohio Rev. Code § 4112.99; and in violation of Ohio public policy. This matter is before the Court on defendants' motion for summary judgment (Doc. 31), plaintiff's memorandum in opposition (Doc. 32), and defendants' reply memorandum. (Doc. 33).

A motion for summary judgment should be granted if the evidence submitted to the court demonstrates that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). The moving party must demonstrate the absence of genuine disputes over facts which, under the substantive law governing the issue, could affect the outcome of the action. *Celotex Corp.*, 477 U.S. at 323.

In response to a properly supported summary judgment motion, the non-moving party "is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial." *Sixty Ivy Street Corp. v. Alexander*, 822 F.2d

1432, 1435 (6th Cir. 1987); *Harris v. Adams*, 873 F.2d 929, 931 (6th Cir. 1989). "[A]fter a motion for summary judgment has been filed, thereby testing the resisting party's evidence, a factual issue may not be created by filing an affidavit contradicting [one's own] earlier deposition testimony." *Davidson & Jones Dev. Co. v. Elmore Dev. Co.*, 921 F.2d 1343, 1352 (6th Cir. 1991).

The trial judge's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine factual issue for trial. *Anderson*, 477 U.S. at 249-50. The trial court need not search the entire record for material issues of fact, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 (6th Cir. 1989), but must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52.

If, after an appropriate time for discovery, the opposing party is unable to demonstrate a *prima facie* case, summary judgment is warranted. *Street*, 886 F.2d at 1478 (citing *Celotex* and *Anderson*). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**I. Facts**

AK Steel contracted with Strom, a temporary staffing agency, to provide temporary replacement workers during a labor dispute that began in March 2006 at AK Steel's Middletown, Ohio facility. Strom coordinated employment, transportation and payroll issues from an off-site office in Franklin, Ohio. On-site management and supervision of temporary employees were provided by AK Steel management.

2

Plaintiff worked for LTV Steel from April 1978 to December 2001, with 13 of those years as a crane operator. (Pl. Depo. at 14-16). In March 2006, plaintiff applied for work as a temporary crane operator at AK Steel after viewing Strom's newspaper advertisement. Plaintiff was hired by Strom and began work on March 17, 2006. (Pl. Depo., Exh. 3). Of the approximately 200 crane operators at AK Steel, seven were female. (Pullen Depo. at 23-24). At the time of her hire, plaintiff was the only woman of the ten to fifteen crane operators hired. (Raine Depo. at 17).

Following a physical examination, orientation, training, and a crane operator's test, plaintiff was assigned to operate an overhead crane in the roll shop. (Pl. Depo. at 30). Cleo Adams, plaintiff's supervisor and manager of the roll shop, assigned plaintiff to Crane No. 409. After two days of training, plaintiff began working the 6:30 p.m. to 6:30 a.m. shift.

After two weeks on the job, plaintiff was told by Mr. Adams she had to be more careful when handling the huge rolls of steel she was responsible for lifting and moving. Plaintiff told Adams that the crane to which she was assigned had a brake problem and was not fixed despite her request. Plaintiff was also aware a truck driver reported that she "dinged" a roll while loading rolls onto trucks. (Pl. Depo. at 38-41; Pl. Depo. Exh. 8; Adams Depo. at 29-31, 51-52). Plaintiff testified that Adams did not criticize her performance on the No. 409 crane after this discussion. (Pl. Depo. at 40-41). Adams testified that about one week later, he spoke with plaintiff about her bumping and marking rolls. Adams advised plaintiff that her poor workmanship had to stop, or he would no longer need her services. (Adams Depo. at 37, 53, Exh. 24). Plaintiff did not recall that discussion. (Pl. Depo. at 45).

3

On one occasion, plaintiff complained to Mr. Adams that she was asked to operate a crane without proper training. (Pl. Depo. at 44). Plaintiff was required to operate this crane for two to three hours. Although Mr. Adams did not criticize her performance in operating this crane, plaintiff states Adams became agitated with her complaint. (Pl. Depo. at 43-44).

On May 4, Manager Ken Sizemore reported to Mr. Adams that plaintiff refused the crew chief's instruction to lift a roll and that she was not in the crane when she was supposed to be working. (Adams Depo. at 33, 36, 55). Plaintiff does not recall refusing to lift the roll. (Pl. Depo. at 47, 50). Mr. Adams noted the report and decided to replace plaintiff as soon as a replacement was available. (Adams Depo. at 38-39, Exh. 23). Plaintiff's last day in the roll shop was Friday, May 5, 2006. (Pl. Depo. at 48-49). Mr. Adams sent plaintiff back to AK Steel's Human Resources Department for reassignment to another job. (Adams Depo. at 38-39). She was told to report to the office on Monday, May 8. (Pl. Depo. at 48-49). Crystal Tillman replaced plaintiff in the roll shop. (Adams Depo. at 39-40). Ms. Tillman's performance operating the No. 409 crane was good, and she stayed at AK Steel until the labor dispute ended and AK Steel's regular employees returned to work. (*Id.* at 40-41).

Plaintiff was reassigned to the slab yard on May 8, 2006. Plaintiff was told that Mr. Adams said she "refused to do a job." (Pl. Depo. at 49). Plaintiff denied she ever refused to do a job, but objected to working on a crane on which she had not been trained. *Id*. Plaintiff testified that the slab yard job was less desirable because the slab yard cranes run continuously and the job involved more stress. (Pl. Depo. at 53; Ledford Depo. at 14; Keenan Depo. at 22).

In the slab yard, hot slabs of steel were unloaded from trains, put in rolling order, and pushed into combustion furnaces. (Keenan Depo. at 13, 15-16). When the mill laborers were not

4

on strike there were four eight-hour shifts each day. Due to the lockout, the employees were working twelve-hour shifts seven days per week. (Keenan Depo. at 17-19). The overhead cranes ran continuously and employees might have to work twelve hours in a row without breaks. (Keenan Depo. at 23, 69). During the labor dispute, the salaried AK Steel employees, and most of the replacement workers, often did not take any breaks during their 12-hour shifts. (Ledford Depo. at 20, 27; Keenan Depo. at 22-24).

Dennis Keenan, the slab yard day manager, met with plaintiff for her safety orientation. (Pl. Depo., Exh. 10). He also explained the basics of the slab yard, including the location of the restrooms. (Pl. Depo. at 57-58, 64-66, Exh. 10). Keenan then asked Don Ledford, the AK Steel shift manager, to take plaintiff up in the crane and let her operate it. (Keenan Depo. at 31-32; Pl. Depo. at 66). Plaintiff was required to climb three flights of steps hand-over-hand to board the crane. (Pl. Depo. at 66-67, 124-125). Plaintiff testified she had worked slab yard cranes before for years, but they boarded differently. (Pl. Depo. at 67, 70; see also Ledford Depo. at 19). After watching Mr. Ledford operate the crane for twenty minutes, plaintiff took over the controls and operated the crane. (Pl. Depo. at 68-69). Ledford then took back the controls and plaintiff asked him questions about the job. (Pl. Depo. at 69). Plaintiff testified that when she asked about bathroom breaks, she was informed that the crane operated continuously, there wasn't a person to give her a break, and if she needed to use the bathroom she would have to urinate off the back of the crane. (Pl. Depo. at 69). Plaintiff testified:

A. I told him that I wasn't able to urinate off the back of the crane, being a female.

Q. And what did he say?

A. And he said, "Well, I don't know what to tell you."

5

Q. Did you go and talk to -- so then –

A. He took me to the landing and I came down and I went to the other supervisor because I-- I was -- I thought he was joshing. I had never had anybody tell me that I had to, you know, urinate off the back of a crane. And I knew it wasn't never allowed. I had worked at LTV all those years, and I knew that was something that --that was a safety issue.

Q. Okay.

A. So I came down and I asked the other foreman and he confirmed what the supervisor in the cab said, that that was the procedure, to urinate off the back of the crane.

Q. They both told you that?

A. Yes.

(Pl. Depo. at 70-71). Plaintiff testified she was upset because she really wanted to work, but could not go without a break to relieve herself. (Pl. Depo. at 74-74). Keenan then called Michael Raine, the Strom Operations Manager, to discuss the situation. Raine told plaintiff to report back to Strom and a van was sent to pick her up. (Pl. Depo. at 128). Plaintiff then left the AK Steel facility and went to Strom's off-site office. (Pl. Depo. at 127-28).

Ledford testified that in his opinion plaintiff could not operate the crane. (Ledford Depo. at 43). Because of her weight, 260 pounds (Pl. Depo. at 124), plaintiff had to push the seat back as far as it would go, and then she could not see out the windows of the cab, so she could not see what she was doing as she tried to lift the heavy slabs. (*Id.* 24-25, 54). In Mr. Ledford's judgment, even though the slab yard was "desperate" for operators, there was "no way" plaintiff could be assigned to work the slab yard crane because she did not possess the skills to operate that particular crane. (*Id.* at 45, 49, 53). Keenan testified he "would have gladly kept" plaintiff to do another job in the slab yard because he "needed people." (Keenan Depo. at 42, 44-45).

6

When plaintiff arrived at Strom's office, she met with Raine and advised him she was told she would have to urinate off the back of the crane if she needed to use the bathroom. (Pl. Depo. at 129; Raine Depo. at 31). Plaintiff advised Raine that if that was the policy, she could not do the job. (Pl. Depo. at 130). Raine contacted AK Steel's Human Resources Department and learned that crane operators "would take a break when they had a chance to take a break," in other words, "when the time was appropriate, when there was no work to be done." (Raine Depo. at 31, 32). Raine had no independent knowledge that any AK Steel manager or supervisor told plaintiff she had to urinate off the back of a crane. (Raine Depo. at 39).

Strom tried to place plaintiff in another position at AK Steel and elsewhere, but plaintiff wanted to run a crane. (Pl. Depo. at 131-32, 133). When no other crane operator position was offered to her, plaintiff left her employment with Strom and AK Steel. (Pl. Depo. at 133). Three weeks after leaving AK Steel, plaintiff returned to the job she had before she started working for Strom. (Pl. Depo. at 20, 132).

Before Strom began providing temporary employees, Strom and AK Steel negotiated pay rates of $25.00 per hour for regular crane operators and $30.00 per hour for "critical" crane operators. (Raine Depo. at 19-21). The determination of which cranes were "critical" was made by AK Steel (Raine Depo. at 21), which was to notify Strom in writing of the designation. (Pullen Depo. at 26-27). When Strom received the notice, it would process the pay increases. Occasionally AK Steel gave the notice a few weeks after a crane was designated as critical. (Ahlstrom Dec. ¶8; Pullen Depo. at 26-27). In those instances, Strom paid any back wages that might be owed upon receipt of the notice. (Pullen Depo. at 26-27). All crane operators affected

by the change–both male and female–experienced a delay in receiving their pay increase. (Doc. 33, Summary of Payroll Delays, attached to Ahlstrom Dec. as Exh. A)

As noted above, when plaintiff began working at AK Steel she was assigned to Crane No. 409. (Pl. Depo. at 32-33). Crane No. 409 was originally classified as a standard crane with a pay rate of $25.00 per hour. (Doc. 31, Ahlstrom Dec. ¶7). On March 30, 2006, AK Steel designated several cranes, including Crane No. 409, as "critical" and the operators became eligible for a $5 per hour increase. AK Steel did not notify Strom of the designation at that time. As a result several employees, male and female, did not receive an increase at that time. (Doc. 31, Ahlstrom Dec. ¶9, 11)

Plaintiff testified that shortly after she began working, she learned she should be paid at the rate of $30.00 per hour for working a high priority crane. (Pl. Depo. at 61). Mr. Adams confirmed she was working a high priority crane and claimed he sent the list of eligible employees to Strom. When plaintiff did not receive the increase, she verbally complained to Strom personnel, and was advised that Strom was waiting on paperwork from Mr. Adams. (Pl. Depo. at 62-62). Plaintiff testified that a male co-worker named Jerry was also not being paid at the proper high priority rate, but then received his increase in pay at the end of April 2006. (Pl. Depo. at 119-120).

Strom did not learn about plaintiff's pay rate increase until after plaintiff left AK Steel on May 7, 2007. (Doc. 31, Ahlstrom Dec. ¶9). Strom immediately paid plaintiff the $5 per hour of back wages. (*Id.* at ¶10; Pl. Depo. at 63). She was paid on or about September 25, 2006. (Pl. Depo. at 88, Exh. 12). Plaintiff admits that Strom and AK Steel do not owe her any wages and that she does not take issue with the rate of pay. (Pl. Depo. at 88, 115-16).

8

**II. Defendants are granted summary judgment on plaintiff's public policy tort claim.**

Count II of plaintiff's complaint alleges a public policy tort claim against defendants. (Doc. 2, ¶¶17-19). Defendants seek summary judgment on this claim. (Doc. 31 at 12). However, plaintiff has failed to respond to or dispute defendants' motion in this regard. Since it appears that plaintiff has abandoned her public policy claim or otherwise failed to respond and create a genuine issue of material fact necessitating a trial on this claim, *Bradley v. Mary Rutan Hosp. Assoc.*, 322 F.Supp.2d 926, 932 n.7 (S.D. Ohio 2004), summary judgment is granted for defendants on plaintiff's public policy tort claim.

**III. Defendants' motion for summary judgment on plaintiff's sex discrimination claims is granted in part and denied in part.**

Plaintiff claims she was discriminated against on the basis of her sex in violation of federal and state law. Title VII makes it unlawful for an employer to discharge an individual or to otherwise discriminate against an individual with respect to compensation, terms, conditions, or privileges of employment because of such individual's sex. 42 U.S.C. § 2000e-2(a)(1). The standards for establishing a discrimination claim under Title VII are equally applicable to plaintiff's claims under Ohio Rev. Code § 4112. *See Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 n.2 (6th Cir. 2000); *Mitchell v. Toledo Hospital*, 964 F.2d 577, 582 (6th Cir. 1992).

An employee may base her claim of employment discrimination on a theory of disparate impact or disparate treatment or both. *Lynch v. Freeman*, 817 F.2d 380, 382 (6th Cir. 1987). Under the disparate impact theory, the plaintiff must show that a facially neutral employment practice falls more harshly on one group than another and that this practice is not justified by business necessity. *Rowe v. Cleveland Pneumatic Co., Numerical Control, Inc.*, 690 F.2d 88, 92

9

(6th Cir. 1982) (citing *Griggs v. Duke Power Co.*, 401 U.S. 424 (1971)). In such a case, proof of discriminatory intent is not required. *Id.*

Under the disparate treatment theory, the plaintiff must show that the employer has treated some people less favorably than others because of their race, color, religion, sex or national origin. Unlike the disparate impact theory, proof of discriminatory motive is critical in the case of disparate treatment. *Rowe*, 690 F.2d at 92 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).

In the instant case, plaintiff proceeds under both the disparate impact and disparate treatment theories of discrimination.

## A. Disparate Impact

Under Title VII, disparate impact causes of action are meant to penalize practices that are "fair in form, but discriminatory in operation." *Phillips v. Cohen*, 400 F.3d 388, 397 (6th Cir. 2005)(quoting *Griggs v. Duke Power Co.,* 401 U.S. 424, 431 (1971)). A disparate impact claim arises when a particular employment practice, which is neutral on its face, produces a significant adverse effect on a protected group which cannot be justified by business necessity. *Raytheon Company v. Hernandez*, 540 U.S. 44, 52 (2003). In order to prove a disparate impact claim, plaintiff must identify the specific employment practice challenged and show that the employment practice in question had a significant adverse effect on the protected group. *Phillips,* 400 F.3d at 397-98; *Isabel v. City of Memphis*, 404 F.3d 404, 411 (6th Cir. 2005); *Kovacevich v. Kent State University*, 224 F.3d 806, 830 (6th Cir. 2000). Once plaintiff establishes a prima facie disparate impact case, the burden of production and persuasion shifts to defendants to demonstrate a business necessity for the practice in question. *Phillips*, 400 F.3d at 398. If

10

defendants succeed in satisfying their burden, the burden shifts back to plaintiff to show either that the defendants' business justification is a pretext for discrimination or that an alternative employment practice exists which would serve the employer's interest without creating the undesirable discriminatory effect. *Isabel*, 404 F.3d at 411; *Kovacevich*, 224 F.3 at 830.

In this case, plaintiff has produced sufficient evidence of a prima facie case of disparate impact. Plaintiff testified that she was informed that the slab yard crane operated continuously, there wasn't a person to give her a restroom break, and if she needed to use the bathroom she would have to urinate off the back of the crane. (Pl. Depo. at 69). Plaintiff testified that Mr. Ledford told her that if she needed to use the restroom, she would have "to urinate off the back of the crane because this crane cannot stop." (Pl. Depo. at 69). Plaintiff testified that Mr. Keenan, the slab yard day manager, confirmed that the procedure for restroom breaks on the overhead crane in the slab yard was to urinate off the back of the crane. (Pl. Depo. at 70-71). Mr. Ledford testified that the males on the slab yard cranes drove their cranes to the end of the building, stepped out onto the platform of the crane, and urinated off the back of the crane and over the building railing. (Ledford Depo. at 28-37). While both Ledford and Keenan deny that plaintiff was told she must urinate off the back of a crane and testified plaintiff was told she could take a break any time she wanted, these facts are in dispute. In addition, Strom's records reflect that plaintiff left her employment at AK Steel because she was asked to urinate off the crane instead of taking a break and using the restroom. (Pl. Depo., Exh. 21; Pullen Depo. at 33). Mr. Raine testified that AK Steel's Human Resources Department reported that crane operators could take breaks "when they had a chance" and "there was no work to be done"(Raine Depo. at 31, 32), which in practice often amounted to no breaks during their 12-hour shifts. (Ledford Depo. at 20,

11

27; Keenan Depo. at 22-24). This evidence, viewed in the light most favorable to plaintiff, the non-movant, establishes a prima facie case of discrimination and, to the extent it is disputed by defendants, establishes genuine issues of fact for trial.

Defendants contend that plaintiff's unsubstantiated testimony that Ledford and Keenan told her she would have to urinate off the back of a crane is insufficient to overcome the motion for summary judgment, citing *Corbett v. Harvey,* 2008 WL 731487, *2 (S.D. Ohio 2008) ("[I]n responding to a summary judgment motion, the nonmoving party cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'") (Doc. 33 at 3).

Plaintiff has presented sworn deposition testimony in support of her claims in this matter. Rule 56(e) permits a summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56(c), including deposition testimony. *Celotex Corp. v. Catrett*, 477 U.S. at 324. Plaintiff's deposition testimony is based on personal observation and experience and is affirmative evidence the Court must not only consider for summary judgment purposes, but must construe in the light most favorable to plaintiff, drawing all justifiable inferences in her favor. *Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587. What defendants are essentially requesting is for the Court to make a credibility determination and to weigh the evidence at this stage of the proceedings. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" on summary judgment. *Anderson,* 477 U.S. at 255. Thus, the Court must consider plaintiff's deposition testimony in the light most favorable to plaintiff in determining whether defendants are entitled to summary judgment on plaintiff's disparate impact claim.

Plaintiff's deposition testimony, when viewed in conjunction with the evidence that crane operators in the slab yard worked 12 hour shifts without breaks, that the slab yard cranes ran continuously, and that the males in the slab yard urinated off their cranes instead of taking restroom breaks, is sufficient evidence from which a reasonable jury could conclude that urinating off the back of the crane in lieu of restroom breaks was a condition of employment in the slab yard.  Plaintiff's deposition testimony presents sufficient evidence to withstand defendants' motion for summary judgment and, to the extent it conflicts with the evidence presented by defendants, presents a credibility issue that may not be resolved on summary judgment.

Defendants also argue that plaintiff fails to establish her prima facie case of disparate impact because she does not produce evidence she was adversely impacted by the alleged policy and submits no evidence that anyone else was ever told they would have to urinate off the back of a crane, citing *Dunlap v. Tennessee Valley Authority*, 519 F.3d 626 (6th Cir. 2008) (hiring process used for the plaintiff's own interview was insufficient to show same process used for hiring decision of protected group) and *Butts v. McCullough,* 237 Fed. Appx. 1, 9, 2007 WL 1296030, 7 (6th Cir. 2007) (absent  statistical evidence, court is left to speculate about policy or practice's disparate impact on a given group) (Doc. 33 at 4-5).  Defendants' argument suggests that the absence of statistical evidence is fatal to plaintiff's disparate impact claim.

Contrary to defendants' argument, plaintiff need not prove her disparate impact case by statistics. *Lynch*, 817 F.2d at 387 (statistics are not the only avenue available to prove disparate impact).  Where an "employment practice adversely affects the health of female employees while leaving male employees unaffected" the Court may find such practice has a significantly

13

discriminatory impact. *Lynch*, 817 F.2d at 388. In *Lynch*, a female carpenter apprentice alleged

sex discrimination against her employer for its failure to provide adequate, sanitary toilet

facilities on a construction site next to a powerhouse. The *Lynch* Court determined that the

condition of the portable toilets made available for workers limited female employees in a way

that adversely affected their status as employees based solely on their sex because of their greater

susceptibility to infection and disease from the use of unsanitary facilities, and, thus, had a

disparate impact on female employees. The Court of Appeals noted that "all females were placed

at a higher risk of urinary tract infections by using unsanitary portable toilets or by avoiding the

use of such toilets and holding their urine" while "men were not exposed to the same risks from

using the toilets because of 'anatomical differences between the sexes.'" 817 F.2d at 388.

In the instant case, given the obvious anatomical and biological differences between men

and women and the unique hygienic needs of women, including those during menstrual cycles,

the Court concludes that the practice of requiring women to urinate off the side of a crane in lieu

of restroom breaks, if true, would have a significant discriminatory impact on women.

Plaintiff has presented sufficient evidence to establish a prima facie case of disparate

impact. Since defendants have not demonstrated a business necessity for the practice in question,

*Phillips*, 400 F.3d at 398, defendants' motion for summary judgment on plaintiff's claim of

disparate impact must be denied.

### B. Disparate Treatment

Plaintiff's claims of disparate treatment are analyzed under the burden-shifting analysis

set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Policastro v.*

*Northwest Airlines, Inc.*, 297 F.3d 535, 538 (6th Cir. 2002); *Mitchell*, 964 F.2d at 582. The

14

*McDonnell Douglas* burden-shifting analysis requires that plaintiff first establish a *prima facie* case of discrimination. *Id.* Plaintiff may establish a *prima facie* case of discrimination either by presenting direct evidence of intentional discrimination by defendants, *Terbovitz v. Fiscal Court*, 825 F.2d 111, 114-15 (6th Cir. 1987) (citing *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985)), or by showing the existence of circumstantial evidence which creates an inference of discrimination. *McDonnell Douglas*, 411 U.S. at 802. *See also Talley v. Bravo Pitino Restaurant, Ltd.*, 61 F.3d 1241, 1246 (6th Cir. 1995). Plaintiff may establish a *prima facie* case of sex discrimination by showing: (1) she is a member of the protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position lost; and (4) she was replaced by someone outside the protected class. *McDonnell Douglas Corp.*, 411 U.S. at 802; *Gray v. Toshiba*, 263 F.3d 595, 598 (6th Cir. 2001); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 351 (6th Cir. 1998); *Manzer v. Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994). "In disparate treatment cases, the fourth element may be replaced with the requirement that the plaintiff show she was treated differently from similarly-situated individuals." *Policastro,* 297 F.3d at 539 (citing *Mitchell,* 964 F.2d at 582-83). Such proof "in effect creates a presumption that the employer unlawfully discriminated against the employee." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). Defendants are entitled to judgment if plaintiff does not establish a *prima facie* case. *Mitchell*, 964 F.2d at 582-84.

Once plaintiff has presented evidence sufficient to establish a *prima facie* case of discrimination, the burden of production shifts to defendants to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Burdine,* 450 U.S. at 253; *McDonnell Douglas Corp.*, 411 U.S. at 802. If defendants meet this burden, the burden of production shifts

15

back to plaintiff to demonstrate that defendants' articulated reason is merely a pretext for

unlawful discrimination. *Burdine,* 450 U.S. at 253; *McDonnell Douglas Corp.*, 411 U.S. at 804.

In other words, plaintiff must show that the proffered explanation is unworthy of credence or that

defendants were more likely motivated by a discriminatory reason. *Manzer*, 29 F.3d at 1082.

There must be "a sufficient basis *in the evidence*" for rejecting an employer's stated explanation

for its action. *Manzer*, 29 F.3d at 1083 (emphasis in the original). *See also Gray*, 263 F.3d at

600. Summary judgment in favor of defendants is appropriate where plaintiff is unable to

demonstrate pretext sufficient to rebut defendants' legitimate, non-discriminatory reasons.

*Barnhart v. Peckrel, Schaeffer & Ebeling Co.,* 12 F.3d 1382, 1395 (6th Cir. 1993). "The ultimate

burden of persuasion remains with the plaintiff to prove that the employer's reasons were a

pretext for discrimination *and* that the employer intended to discriminate on the basis of race."

*Thurman*, 90 F.3d at 1166 (emphasis in the original), citing *St. Mary's Honor Center*, 509 U.S.

502, 113 (1993).

The record fails to disclose any direct evidence of intentional discrimination on the part

of defendants. With respect to the circumstantial showing of discrimination, it is undisputed that

plaintiff is a female and a member of the protected class for her sex discrimination claims under

federal and state law. However, plaintiff fails to prove a *prima facie* case of discrimination with

respect to her three principal claims: (1) that she was denied high priority crane pay; (2) that she

was transferred from the roll shop to the slab yard, which was a less desirable position; and (3)

that she was constructively discharged by being told she had to urinate off the back of the crane

as a condition of employment in the slab yard. (Doc. 32 at 9-10).

16

**1. Plaintiff's denial of equal pay claim**.

Plaintiff's complaint alleges that defendants discriminated against her by failing to pay her wages commensurate with male employees in the same job classification. She states that males doing substantially the same work in the roll shop were paid $30.00 per hour while she was paid only $25.00 per hour. (Doc. 2, ¶6). In response to defendants' motion for summary judgment, she states that "Jerry," a male crane operator in the roll shop, started to receive his critical crane pay in April 2006, while she did not. (Doc. 32 at 10, citing Pl. Depo. at 80).

To establish a prima facie case of unequal pay for equal work under Title VII, plaintiff must prove that defendants paid "different wages to employees of opposite sexes 'for equal work on jobs the performance of which require equal skill, effort and responsibility, and which are performed under similar working conditions.'" *Odomes v. Nucare, Inc.,* 653 F.2d 246, 250 (6th Cir. 1981) (quoting *Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974)). Here, plaintiff fails to establish her prima facie case because she fails to show she was paid wages lower than her male counterparts or treated differently than similarly situated male crane operators.

It is undisputed than when plaintiff started at AK Steel in March 2006, Crane No. 409, the crane to which she was assigned, was not designated as a "critical" crane. Thus, plaintiff and her male counterparts were entitled to pay of $25.00 per hour. It is also undisputed that AK Steel designated Crane No. 409 as "critical" on March 30, 2006. While all critical crane operators were then entitled to $30.00 per hour as of that date, it is undisputed that this designation was not immediately communicated to Strom for processing. As a result, at least 20 crane operators, including plaintiff and her male co-worker "Jerry," experienced delays in receiving the increase of $5.00 per hour in critical crane pay. Plaintiff testified that both she and Jerry McClure

17

complained about a delay in receiving pay increases to the same people at the same time. (Pl. Depo. at 80). However, neither plaintiff nor Mr. McClure received a pay increase at that time. Mr. McClure's pay was not increased until June 2006. (Doc. 33, Ahlstrom Decl. ¶4). The evidence shows that many male crane operators, including plaintiff's co-worker Jerry McClure, did not receive their pay increases until well after plaintiff left AK Steel's employment on May 7, 2006. (Doc. 33, Ahlstrom Decl. ¶3 and Exh. A). As soon as Strom learned of the re-designation of the crane operated by plaintiff, it immediately processed the increase and paid plaintiff her back wages. (Pl. Depo. Exhs. 12-14; Pullen Depo. at 26-27). Plaintiff admits she received her full back-pay for her critical crane operator job. (Pl. Depo. at 88-89, 115-116).

Plaintiff fails to establish that she received less pay than her male counterparts or that similarly situated males were treated more favorably with regard to critical crane pay. Therefore, plaintiff fails to establish a prima facie case of discrimination in pay. Accordingly, summary judgment is granted for defendants on this claim.

**2. Plaintiff's claim that she was transferred from the roll shop to the slab yard.**

Plaintiff's complaint also alleges that she was falsely accused of damaging a mill roll while operating a crane and transferred to a less desirable job in the slab yard. (Doc. 2, ¶8). Plaintiff alleges that male employees who committed similar infractions were not disciplined or transferred. (Doc. 2, ¶9). Specifically, plaintiff testified that "Vinnie," a male crane operator, was not transferred out of the roll shop even though she observed him ding rolls of steel during the two days he trained her. (Pl. Depo. at 55).

Plaintiff fails to establish a *prima facie* case of discrimination on this claim because she was replaced by a female crane operator, Crystal Tillman (Adams Depo. at 39-40), and no

18

similarly situated male crane operators were treated more favorably than plaintiff. Although plaintiff testified she observed Vinnie ding rolls of steel, there is no evidence that any complaints were reported to Mr. Adams about Vinnie's actions. (Adams Depo. at 43). However, Mr. Adams did receive complaints about plaintiff's performance and counseled her to be more careful when handling the huge rolls of steel she was responsible for lifting and moving. Plaintiff admitted she was aware a truck driver reported that she "dinged" a roll while loading rolls onto trucks. (Pl. Depo. at 38-41; Pl. Depo. Exh. 8; Adams Depo. at 29-31, 51-52). Nor does plaintiff present any evidence that any other male crane operators were treated more favorably in this regard.

In addition, plaintiff has failed to show she suffered an adverse employment action by her transfer from the roll shop to the slab yard. To constitute an "adverse" employment action, the employment action must amount to "a materially adverse change" in the terms or conditions of employment and be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 885, 886 (6th Cir. 1996) (internal quotations omitted). The particular employment action must be "objectively intolerable to a reasonable person." *Policastro*, 297 F.3d at 539. Generally, a lateral transfer is not a materially adverse action. *Mitchell v. Vanderbilt University*, 389 F.3d 177, 183 (6th Cir. 2004).

Plaintiff alleges that the slab yard was "a less desirable assignment" because "it was a continuous job with more stress for the same pay." (Doc. 32 at 3, 9). An employee's "subjective impression concerning the desirability of one position over another generally does not control with respect to the existence of an adverse employment action." *Mitchell*, 389 F.3d at 183 (citing *Policastro,* 297 F.3d at 539; *Henry v. Ohio Dept. of Mental Retardation & Dev. Disabilities,* 162 F. Supp.2d 794, 801 (S.D. Ohio 2000) (in turn citing *Kocsis,* 97 F.3d at 886). From an objective

standpoint, plaintiff would be required to work the same number of hours and would receive the

same pay in the slab yard as in the roll shop. *See Kocsis*, 97 F.3d at 885 ("reassignments without

salary or work hour changes do not ordinarily constitute adverse employment decisions").

Plaintiff's assertion that the job was less desirable, without more, fails to establish that her

reassignment to the slab yard was an adverse employment action for purposes of her employment

discrimination claim. Plaintiff fails to present evidence establishing a question of fact as to

whether her reassignment to a crane operator position in the slab yard was a materially adverse

employment action and therefore fails to establish this element of her prima facie case of

employment discrimination. Accordingly, defendants' motion for summary judgment on this

claim is granted.

### 3. Plaintiff's claim concerning denial of restroom breaks in the slab yard.

Plaintiff claims she was constructively discharged by being told she had to urinate off the

back of the crane as a condition of employment in the slab yard. (Doc. 32 at 9-10). Defendants

contend plaintiff's claim of constructive discharge must be dismissed because neither her EEOC

charge nor her complaint alleges a claim for constructive discharge.

The Court notes that "[c]onstructive discharge is not itself a cause of action, but rather a

means of proving the element of an adverse employment action where the employee resigns

instead of being fired." *Corbett v. Harvey*, 2008 WL 731487, *11 -12 (S.D. Ohio 2008) (citing

*Logan v. Denny's Inc.,* 259 F.3d 558, 568 (6th Cir. 2001) (plaintiff may establish an adverse

employment action by demonstrating that she was constructively discharged); *Starks v. New Par,*

No. 98-1300, 1999 WL 357757 at *5 (6th Cir. May 11, 1999) (constructive discharge not a cause

of action); *Kroll v. Disney Store, Inc.,* 899 F. Supp. 344, 347 (E.D. Mich. 1995) (constructive

discharge is not an independent claim, but rather requires an underlying cause of action for employment discrimination)). Thus, the fact that plaintiff's EEOC charge and complaint do not allege a claim for "constructive discharge" does not mandate dismissal of her discrimination claim. *See Randolph v. Ohio Dept. of Youth Services*, 453 F.3d 724, 732 (6th Cir. 2006) (citations omitted) (failure of charge to contain exact wording of claim not dispositive). Rather, the Court must construe the EEOC charge liberally "to encompass all claims 'reasonably expected to grow out of the charge of discrimination.'" *Id.* (quoting *Haithcock v. Frank,* 958 F.2d 671, 675 (6th Cir. 1992) (internal quotation marks and citation omitted)).

Plaintiff's EEOC charge and complaint allege that she was terminated from her position at AK Steel when she stated she would not urinate off the back of a crane as it was unsanitary and that such termination was without just cause on account of her sex, female. (Pl. Depo., Exh. 9; Doc. 2). Plaintiff's EEOC charge and complaint present facts indicating her termination was based on her refusal to urinate off the back of a crane and give defendants sufficient notice of her discrimination claim based on sex. Liberally construed, the charge and complaint sufficiently allege termination of employment based on intolerable conditions (*i.e.*, being forced to urinate off the back of a crane) and on the basis of sex. *Randolph*, 453 F.3d at 732. A reasonable EEOC investigation of plaintiff's charge would have encompassed a claim of sex discrimination and an adverse action premised on constructive discharge. Therefore, the Court declines to dismiss plaintiff's claim on this basis.

Nevertheless, plaintiff fails to establish an adverse employment action based on constructive discharge on the record before the Court. To establish a constructive discharge claim, an employee must demonstrate that the employer "deliberately create[d] intolerable

21

working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit." *Moore v. KUKA Welding Systems & Robot Corp.,* 171 F.3d 1073, 1080 (6th Cir. 1999). A constructive discharge analysis requires an examination of the objective feelings of the employee and the intent of the employer. *Goldmeier v. Allstate Ins. Co.*, 337 F.3d 629, 636 (6th Cir. 2003). "Intent can be shown by demonstrating that quitting was a foreseeable consequence" of the employer's conduct. *Moore,* 171 F.3d at 1080.

Plaintiff has made no attempt to apply the law of constructive discharge to the facts of her case. Even assuming, arguendo, that plaintiff could establish intolerable working conditions in that she, as a female working in the slab yard, was unable to take a restroom break while male employees were able to take a break by urinating off the side of their cranes, plaintiff nonetheless fails to present evidence showing defendants deliberately created such intolerable conditions "with the intention of forcing" plaintiff to quit.

The undisputed evidence shows that AK Steel was in need of temporary workers because of an ongoing labor dispute and wanted to retain plaintiff as a temporary employee. (Keenan Depo. at 42, 44-45; Ledford Depo. at 45). Keenan testified he "would have gladly kept" plaintiff to do another job in the slab yard, because he "needed people." (Keenan Depo. at 42, 44-45). Strom tried to place plaintiff in another position at AK Steel and elsewhere, but plaintiff rejected such offers because she wanted to run a crane. (Pl. Depo. at 131-32, 133). Strom's offer to find plaintiff other temporary employment at AK Steel strongly suggests the absence of any such intent to force plaintiff to resign. *Goldmeier*, 337 F.3d at 636. "The presentation . . . of other legitimate options for continued employment with the company, even in less prestigious

22

positions, precludes a finding that [an employee] was constructively discharged." *Wilson v. Firestone Tire & Rubber Co.*, 932 F.2d 510, 515 (6th Cir. 1991).  Plaintiff admits she had the option to remain employed by defendants in another capacity but chose to resign instead because she wanted a crane operator's job.  Given plaintiff's admission that she had the option to remain employed with defendants, that defendants were willing to place plaintiff in another job, and that plaintiff chose instead to resign based on her personal preference, plaintiff has failed to demonstrate a genuine issue of material fact that she was constructively discharged. *LaPointe v United Autoworkers Local 600*, 103 F3d 485, 489 (6th Cir. 1996).  Therefore, defendants are entitled to summary judgment on this claim.

For the foregoing reasons, defendants' motion for summary judgment is **DENIED** with respect to plaintiff's discrimination claim based on disparate impact, but **GRANTED** with respect to plaintiff's discrimination claim based on disparate treatment.

**IT IS SO ORDERED.**

Date: 5/22/08

Timothy S. Hogan
United States Magistrate Judge

23